UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUSLAN KIRILYUK,<br><br>Defendant. | No. 2:14-cr-83-GEB<br><br>**ORDER OVERRULING DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT** |

Defendant Ruslan Kirilyuk objects to findings in the Presentence Report ("PSR"). The United States opposes the objections.

Kirilyuk objects to paragraph 7 in the PSR arguing "[t]here is no evidence that [he] opened a fake American Express merchant account in the name of [L.D.] using the high school transcript that was introduced at trial." Def's Obj. at 5:7-9. The United States rejoins:

> To the extent Kirilyuk argues the evidence did not
> show he personally took all of the steps to steal and

1

misuse L.D.'s identity, the government agrees.
However, Kirilyuk was convicted beyond a reasonable
doubt by the jury for his participation in this
unlawful use of L.D.'s personally identifying
information.  This finding was well supported by, among
other pieces of evidence, the recovery of Kirilyuk's
fingerprint from L.D.'s student transcript that was
used to open the merchant account. Moreover, to the
extent that others also assisted in the crime, Kirilyuk
is responsible for the reasonably foreseeable acts
taken by his coconspirators in furtherance of the
criminal agreement. See, e.g., 18 U.S.C. § 2; Ninth
Cir. Crim. Jury Inst. 5.1; U.S.S.G. § 1B1.3.
Therefore, while Kirilyuk was not the only person who
was involved in the scheme, the PSR correctly states
that he used the name and social security number of
L.D. to open the account.  If any change is to be made
to the language in the PSR, the government suggests
that it be revised to state that Kirilyuk and his co-
defendants used the name and social security number of
L.D."

Gov't's Sen. Memo and Response to Objs. at 3:17-28, ECF 385.

The United States is correct. This objection is overruled.

Kirilyuk objects to paragraph 17 in the PSR arguing he never made the statement attributed to him in the paragraph. The government's following response to this objection accurately states the evidentiary record concerning the objection: Kirilyuk "objects to a statement made in a chat by his coconspirators. This chat was a contemporaneous statement made in the course of the conspiracy by Kirilyuk's coconspirators. It was . . . admitted at trial and it belongs in the PSR because it describes Kirilyuk's interactions with his coconspirators. [The statement] is very probative of Kirilyuk's position as the leader of the fraud scheme whose leadership style was not always appreciated by his coconspirators." Sentencing Memor. and Resp. to Objs. at 4:28, 5:1-2 and 4-5, ECF 385. Therefore, the objection to paragraph 17 is overruled.

Kirilyuk objects to the $59,956,500 intended loss amount in paragraph 29 of the PSR. However, clear and convincing evidence in the trial and sentencing records supports this paragraph. The evidentiary record includes the following findings:

> A Federal Bureau of Investigation (FBI) investigation revealed a criminal network which operated 71 false online businesses to commit credit card fraud from 2011 to 2014. The investigation identified Mihran Melkonyan, Rouslan Akhmerov,

Aleksandr Maslov, and Ruslan Kirilyuk as conspirators. Melkonyan, Akhmerov, Maslov, and Kirilyuk operated the fraudulent online businesses by submitting fraudulent charges to stolen American Express credit card and debit card accounts. The FBI found that approximately 119,913 stolen American Express credit cards or debit cards were used, which resulted in 190,321 transactions being submitted to American Express. Each transaction usually was within the price range of $15 to $30. American Express approved approximately 84,032 of these charges, which resulted in $1,418,959 in fraudulent charges being approved, but the intended loss was more than $3.4 million.

Paragraph 5 in the PSR at 5.

Further, the method used to calculate the intended loss stated in paragraph 29 of the PSR is supported by the advisory guidelines; specifically, "[e]ach device is valued at $500." PSR at paragraph 29; See United States v. Dobadzhyan, 677 Fed.Appx. 454, 455(9th Cir. 2017) ("In cases, such as this one, involving altered or counterfeit instruments, U.S.S.G. § 2B1.1(b)(1) sets increases in criminal offense levels based on the amount of loss [; and a] court may impose a charge of $500 per counterfeit access device number. U.S.S.G. § 2B1.1, cmt. n.3(F)(i); United

4

States v. Popovski, 872 F.3d 552, 553, (7th Cir. 2017) cert. denied 138 S.Ct. 1017 (2018)("Application Note 3(F)(i) to § 2B1.1 provides: 'In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device.'").

The United States is correct in the following assertions in its brief: "[The intended] loss amount was shown through a variety of links, including transaction signatures, items recovered in search warrants, linked bank accounts, common IP addresses, witness testimony, and other evidence. Corroborated testimony further established that Kirilyuk was a knowing participant in [the] full scheme." United States' Sentencing Memor. and Resp. to Objs. at 5:12-15.

Kirilyuk's objection to paragraph 29 is overruled.

Kirilyuk also objects to paragraph 30 in the PSR arguing it erroneously contains an increase in his sentencing offense level "for [the] number of victims [, and that the] 'victim impact', paragraph makes it clear that only AMEX suffered any actual loss. AMEX made all cardholders whole. For the purposes of this adjustment, 'victim' is a term of art which means a person who has suffered any part of 'actual loss.'" Def.'s Obj. at 14:12-14,

5

ECF 388. The Ninth Circuit states in United States v. Pham, 545 F.3d 712, 719 (9th Cir. 2008) (internal quotations omitted): "there may be situations in which a person could be considered a victim under the Guidelines even though he or she is ultimately reimbursed." This case presents such a situation. Paragraph 11 in the PSR contains the following information on some of the victims found during an executed search warrant at Akhmerov's residence in Studio City, California:

> FBI agents seized photocopies of approximately 222 [stolen high school] student transcripts from the Sacramento area which contained handwritten notes. The handwritten notes included credit scores, bank account numbers, e-mail addresses, American Express merchant account information, and logins and passwords required to access various online accounts. Some of these students' identities were utilized to open the fraudulent online businesses. Agents also discovered two separate bank accounts which were established in two of the Russian students' names. FBI agents also seized several bank debit cards, checkbooks, $196,000 in cash, and more than 50 MoneyPak reloadable cards . . . . A forensic analysis of the student transcripts

revealed 180 latent fingerprints belonged to Akhmerov, and one matched Kirilyuk.

The United States is correct in its following response to this objection and this response is adopted as additional sentencing findings:

> Kirilyuk argues implausibly that there were not ten or more victims of his . . . credit card and identity theft fraud scheme. Based simply on the trial evidence, this claim is false. A person suffering a temporary loss can be counted as a victim . . . As set forth at trial, the entire scheme was structured to make it less likely that the scheme would be uncovered and the refund instantaneous. Charges were intentionally kept small to avoid being noticed. Company names were selected that made it less likely that they would stand out on a credit card statement. The purpose of structuring the scheme in this manner was to get victims to ignore the charges and pay their credit card bills. This was essential to the scheme—if enough victims complained about fraudulent charges too quickly, the credit card company would spot the fraud, shut down the merchant account, and claw back whatever stolen money was still in the merchant account. Given

7

this scheme structure, [and] the approximately 190,000 charges to approximately 119,913 unique American Express credit card numbers, netting well over $1.4 million . . . at least 10 card holders (approximately 0.0083% of the total number) [paid] their credit card bills without noticing and contesting the charges. The government trial exhibits and testimony . . . show [] that the victims paid money before the charges were eventually discovered and reversed. Trial testimony established that the credit card company would shut down a company if there were too many indicators of fraud, including charges that needed to be refunded. In some cases, this meant that companies were closed within a very short time of being opened; however, in some cases the defendants companies were more successful at avoiding a large number of early charge backs and had a longer life. Government trial exhibit 2 was a timeline that shows the life cycle of many of the various shell companies from the first fraudulent charge to the last. At least fourteen of those companies spanned a period of three months or more between the first and last charge. Many other fraudulent companies lasted more than two months. That means that many of the victims in the first months of

8

operation could not have spotted the charges and asked to have them be reversed—if they had, the companies would not have made it to the subsequent months because American Express would have closed their merchant accounts. Similar information was contained on government trial exhibit 1. Trial exhibit 1 listed the specific billing date ranges for the fraudulent companies as well as the total amount billed and the number of fraudulent charges. From this exhibit it is clear that the companies that operated for more than three months were collectively responsible for thousands of fraudulent charges to thousands of unique cards.

Even where charges were identified by victims and timely reversed, it was not without effort on the part of many of the victims. At trial, numerous cell phones were introduced into evidence that had company information written on the back of them. Many of these phones were used to field calls from people complaining about fraudulent charges in order to get them reversed. This process was not automatic and was, therefore, an additional burden on victims of the scheme.

Kirilyuk also overlooks the dozens of student

9

victims whose identities and credit were used in order to open fraudulent businesses. Their names are in the record in Exhibit 1, testimony of some of those victims at trial, and through the student transcripts admitted at trial. When the fraudulent businesses were shut down, that inevitably had an impact on the credit of those students. As they reach a point where they need to access credit to buy cars or homes, or even to get credit cards, those students will either suffer financially or will have to go through the time consuming process of getting their credit report corrected.

[L]isted below are more than ten specific victims that support the enhancement. These victims include the credit card company, several banks who took losses when the shell accounts created and used to carry out the fraud were shut down or abandoned, and a small sampling of the credit card holders:

1. American Express—Losses related to repaying the victim cardholders . . .

2. Citibank—On February 19, 2013, the shell bank account in the name of Evgenia Romanova, account -9732, caused a $289.35 loss in the form of a misc bank

credit. Ex 1.

3. Wells Fargo Bank—On July 29, 2013, the shell bank account in the name of Daria Puchkova, account -5344, caused a $677.00 loss in the form of a fees charge off and a $7.99 closeout chargeoff credit. Ex. 2.

4. Chase Bank—On June 5, 2013, the shell bank account in the name of Evgenia Romanova, account -5730, caused an $816.48 loss in the form of an overdraft write off credit. Ex. 3.

5. Bank of America—On February 27, 2013, the shell bank account in the name of Evgenia Romanova, account -1726, caused a $470.34 loss in the form of a force closed account credit. Ex. 4.

6. U.S. Bank—On November 23, 2012, the shell bank account in the name of Angelina Kikot, account -0886, caused a $48.77 loss in the form of a charge off overdrawn account credit. Ex. 5.

7. J.G.—Victim cardholder who did not notice a fraudulent charge from Jack BC. Ex. 6.

8. V.B.—Victim cardholder who did not notice a fraudulent charge from RP Art. Ex. 7.

9. D.M.—Victim cardholder who did not notice a fraudulent charge from Depper. Ex. 8.

10. L.A.—Victim cardholder who did not notice a fraudulent charge from RD Wireless. Ex. 9.

11. C.B.—Victim cardholder who did not notice a fraudulent charge from RD Wireless. Exs. 10, 11.

Sentencing Memor. and Resp. to Objs. at 7:7-9, 14-28, 8:1-26, 9:1-22.

Individuals and entities can be "be considered 'victims' for purposes of § 2B1.1 despite ultimately recovering most or all of their initial losses." Pham, 545 F.3d at 719. For the stated reasons Kirilyuk's objections to paragraph 30 in the PSR are overruled.

Kirilyuk also objects to paragraph 32 in the PSR arguing his offense level should not have been increased for the use of authentication features. The enhancement is justified for the reasons stated in the PSR and under U.S.S.G. §2B1.1(b)(11)(A)(ii). Therefore, the objection is overruled.

Kirilyuk also objects to the leadership offense level enhancement in paragraph 34 of the PSR. The evidentiary record evinces Kirilyuk was a leader of the criminal scheme, and as such he is responsible for his own acts and for the reasonably

12

foreseeable acts taken by his co-schemers in furtherance of the criminal scheme. The following adopted findings in the PSR are part of the findings supporting the leadership enhancement:

> "On May 7, 2014, Akhmerov told an FBI agent that he began working with Kirilyuk in 2012. Kirilyuk told Akhmerov that he worked with computer hackers in Russia who had access to stolen credit card data. Kirilyuk's job was to open businesses and online retail businesses that supposedly sold electronic books and video games. Kirilyuk used other individuals' identities to open the bank accounts, credit card accounts, and merchant accounts for these businesses. Kirilyuk told Akhmerov he had been involved with this type of employment for approximately 10 years and worked with individuals in Sacramento and Los Angeles, California. Once a business had been created, Kirilyuk's Russian partners used the businesses to process fraudulent charges on stolen credit card accounts. Akhmerov advised the FBI agent that he drove Kirilyuk to meetings, checked websites, sent faxes, purchased prepaid cell phones, withdrew money from ATMs, and picked up items from mailboxes. Akhmerov also lived with Kirilyuk from 2012 to 2013. Kirilyuk provided digital storage media,

13

driver licenses, personal identifying information,
             student transcripts, and bank records related to the
             businesses they established.  Kirilyuk introduced
             Akhmerov to his business associates, Andrey Bgatov and
             Melkonyan.

Paragraph 8 in the PSR.

   Further, as the United States asserts in its brief: "The trial evidence corroborate[s] Akhmerov's testimony [that Kirilyuk was the leader of this scheme]. For example, contemporaneous chats introduced by the government at trial showed that other members of the scheme referred to (and complained about) Kirilyuk's position as the leader of the scheme and the way he bossed around other members of the scheme.  Kirilyuk's attacks on Akhmerov's credibility simply fail under the weight of the trial evidence." Sentencing Memor. and Resp. to Objs. at 4:7-12.

   The objections to paragraph 34 in the PSR are overruled.

   Kirilyuk also objects to paragraph 39 in the PSR arguing he "should receive a decrease [in his offense level] for acceptance of responsibility."  Def's Obj. at 17:3. Kirilyuk did not take full responsibility for all of his criminal actions and therefore is not entitled to this reduction in his offense level.  The objection is overruled.

A copy of this order shall be appended "to any copy of the presentence report made available to the Bureau of Prisons." Fed. Rule of Crim. Proc. 32(i)(3)(c).

Dated: December 6, 2019

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge